UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

**FILED**

03 MAY 28  PM 2: 07

*kl*

| | | |
|---|---|---|
| SANDRA D. WEBB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-01-S-2402-NE |
| | ) | |
| FORTIS BENEFITS INSURANCE | ) | |
| COMPANY, | ) | **ENTERED** |
| | ) | |
| Defendant. | ) | MAY 2 8 2003 |

**MEMORANDUM OPINION**

Plaintiff, Sandra D. Webb, a former employee of Beaulieu Group, L.L.C., filed this action under sections 1132(a)(1)(B) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Plaintiff claims that she was wrongfully denied long-term disability benefits pursuant to her employer's group, long-term, disability insurance policy. The policy was underwritten by defendant, Fortis Benefits Insurance Company ("Fortis" or "defendant"). The action now is before the court on defendant's motion for summary judgment.

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.

The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

Upon consideration of the pleadings, evidentiary submissions, and briefs, the court concludes that Fortis's motion for summary judgment should be granted.

## I. SUMMARY OF FACTS

Plaintiff's former employer, the Beaulieu Group, manufactures fibers and fabrics which are used in the production of carpets. Prior to her resignation on March 19, 1998, plaintiff had worked for Beaulieu as a "twister operator," a position which is classified as "light duty." (The United States Department of Labor and Social Security Administration define a synonymous term, "light work," in the following manner: "lifting no more than 20 lbs. on an occasional basis and up to 10 lbs. on a more frequent basis. Light work typically requires standing and walking for six hours out of an eight-hour workday. . . .'"[1])

Fortis began providing group, long term disability insurance benefits ("LTD") to Beaulieu's

---

[1] Defendant's evidentiary submission, Tab 1, at FOR-00347 (TOP Rehab Services Functional Capacity Evaluation Summary Report) (emphasis supplied). *Nota bene*: Both parties refer to the large quantity of documents relating to plaintiff's disability claim bound under Tab 1 of defendant's evidentiary submission by reference to the five-digit Bates stamp number impressed on each page, and so will this court. **Accordingly, all subsequent references to "FOR-00###" are to the page number(s) of documents collected under Tab 1 of defendant's evidentiary submission** (doc. no. 17).

employees on February 1, 1998, just a little over one month before plaintiff resigned her employment due to a claimed disability.  The LTD benefits were a component of Beaulieu's employee welfare benefit plan.[2]  The plan was fully insured, and Fortis paid claims from its own assets.[3]  Fortis also served in a fiduciary capacity as claims administrator.[4]

The nub of the dispute between plaintiff and Fortis revolves around the fact that Beaulieu's plan prescribed two "occupational tests" for determining an employee's entitlement to LTD benefits. The first test applied during the first twenty-four months of a period of disability, and the second applied thereafter.

Plaintiff was awarded LTD benefits under the first occupational test — requiring that, during the first twenty-four months of a period of disability, the employee must be under the regular care and attendance of a physician, *and*, the disabling condition must prevent the employee from performing at least one of the material duties of her regular occupational position — and received disability benefits for a period of twenty-four months.

At the end of that twenty-four-month period, plaintiff was re-evaluated under the second occupational test — requiring that the disabling condition prevent the employee from performing at least one of the material duties of each gainful occupation for which the employee was qualified

---

[2] FOR-00001 (Beaulieu Group policy).  The term "employee welfare benefit plan" is defined by ERISA as

any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such a plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of . . . disability.

29 U.S.C. § 1002(1).

[3] Plaintiff's evidentiary submissions, Tab A (Higgins deposition), at 60.

[4] *Id.* at 62.

by her education, training, or prior work experience — and was denied continued LTD benefits. The relevant provisions of the contract of insurance between Beaulieu and Fortis read as follows:

**Insurance Provided**

If you become *disabled* while insured under the *policy*, we will pay long term disability insurance benefits if you satisfy the *qualifying period*. We will continue to pay benefits during your *disability*, but not beyond the Maximum Benefit Period. Any benefits are subject to the provisions of the *policy*.[5]

. . . .

*Disability* or *disabled* means that in a particular month, you satisfy either the Occupation Test or the Earnings Test, as described below. You may satisfy both the Occupation Test and Earnings Test, but you need only satisfy one Test to be considered *disabled*.

**Occupation Test**

- during the first 24 months of a *period of disability* (including the *qualifying period*),[6] an *injury*, or sickness, or pregnancy requires that you be under the *regular care and attendance* of a *doctor*, and prevents you from performing at least one of the *material duties* of your regular occupation; and

- after 24 months of *disability*, an *injury*, sickness, or pregnancy prevents you from performing at least one of the *material duties*[7] of each *gainful occupation*[8] for which your education, training, and experience qualifies you.[9]

---

[5] FOR-00017 (emphasis in original).

[6] The term "qualifying period" is defined as "the length of time during a *period of disability* that you must be *disabled* before benefits are payable." FOR-00008 (emphasis in original). "Period of disability" is defined as "the time that begins on the day you become *disabled* and ends on the day before you return to *active work*." FOR-00007 (emphasis in original). "Active work" is defined as meaning "working *full-time* for the *policyholder* or an *associated company* at your usual place of business." FOR-00004 (emphasis in original). Contrary to the prevailing workplace definition, "full-time" employment is defined as "working at least 20 hours per week . . . ." *Id.*

[7] The term "material duties" is defined as "the set of tasks or skills required generally by employers from those engaged in a particular occupation. One *material duty* of your regular occupation is the ability to work for an employer on a *full-time* basis as defined in the *policy*." FOR-00006 (emphasis in original).

[8] The term "gainful occupation" means "an occupation in which you could be reasonably expected to earn at least as much as your Schedule Amount" of LTD benefits. FOR-00006. Plaintiff's "Schedule Amount" under the terms of the Beaulieu plan was $900 per month. *See* FOR-00012.

[9] FOR-00005 (emphasis in original) (footnotes added).

-4-

. . .

> We have the sole discretionary authority to determine eligibility for participation or benefits and to interpret the terms of the Policy.   All determinations and interpretations made by us are conclusive and binding on all parties.[10]

## A.    Plaintiff's Initial Claim for LTD Benefits

Beaulieu submitted an application for LTD benefits on plaintiff's behalf on August 5, 1998.[11] The employer's portion of the application stated that plaintiff had been employed with Beaulieu from April 28, 1996 until March 19, 1998.[12] This portion also indicated that plaintiff worked a rotating schedule of three days one week and four days the following week, with an average shift of twelve hours per day.[13]

Plaintiff's portion of the application provided that she was experiencing pain in her chest, abdomen, and arms, which allegedly prevented her from working.[14]  The pain was attributed to a condition known as fibromyalgia.[15]  Plaintiff stated in her application that the pain began on March 13, 1998, and she was unable to work after that date.[16]  Plaintiff listed her treating physicians as Durwood Hodges, Troy Layton, Rajesh Patel, and Macon Phillips.[17]

Tim Edwards, a Benefit Specialist employed by Fortis, acknowledged receipt of plaintiff's

---

[10] FOR-00026.

[11] FOR-00658-64 (Long-Term Disability Benefits Claim Form dated June 5, 1998).

[12] FOR-00658.

[13] Id.

[14] FOR-00660.

[15] FOR-00662.  At deposition, Dr. Hodges explained that fibromyalgia "is an inflammation of the soft tissues, basically the muscles, and maybe a little ligaments and tendons.  Sometimes it can be — especially in the area she was talking about — around the cartilages, which would be more of a costochondritis.  But basically it's kind of an inflammation and a form of arthritis basically in the muscle tissues themselves."  Plaintiff's evidentiary submissions, Tab C (Hodges deposition), at 7.

[16] FOR-00660 (Long-Term Disability Benefits Claim Form dated June 5, 1998).

[17] Id.

claim on August 25, 1998,[18] and informed her that Fortis needed the names of any physicians who had treated her from August 1, 1997 to January 31, 1998, as well as the names and telephone numbers of any pharmacies from which she had obtained prescription medications during the same time period.[19]

Ultimately, Fortis determined that plaintiff's initial claim for LTD benefits was valid, and began making payments to her in the monthly amount of $900 on October 13, 1998 (along with two lump-sum payments to cover a period dating back to June 19, 1998). The payments continued until June 29, 2000, when plaintiff's LTD benefits were terminated.[20]

**B.   Re-evaluation**

About a year after beginning payments to plaintiff, *i.e.*, on September 7, 1999, Fortis mailed letters to plaintiff's treating physicians, asking several questions to aid the company in determining whether plaintiff would be entitled to receive LTD benefits following her initial, twenty-four-month period of eligibility.[21]  Fortis informed plaintiff by means of a letter dated May 4, 2000 that her continued entitlement to LTD benefits would be evaluated pursuant to the second occupational test.[22]

Fortis eventually determined that plaintiff did not meet the criteria necessary to receive LTD benefits beyond the initial, twenty-four-month period.  In making that determination, it relied upon the studies, evaluations, diagnoses, and other documents generated by the health care professionals who had either provided treatment to, or evaluated, plaintiff.  Among the documents considered by Fortis was a May 5, 1998 progress note authored by Dr. Troy Layton, reading, in pertinent part, as

---

[18] FOR-00629 (Fortis letter dated Aug. 25, 1998).

[19] FOR-00629-30.

[20] Joint Stipulation of Fact (doc. no. 28) ¶ 2.

[21] FOR-00377, 00444, 00461, and 00472 (Fortis letters dated  Sept. 7, 1999).

[22] FOR-00342-43 (Fortis letter dated May 4, 2000).

follows:

> Mrs. Webb is here for follow up of her bonescan, which was normal to radiological interpretation, and I concur with that reading. Based on this and her location of the pain in the epigastric area, I really do not feel that her problem has an orthopedic etiology. *I am concerned as to her complete refusal to return to work.*[23]

As a part of plaintiff's initial application process, she had been required to submit an "Attending Physician's Initial Statement of Disability." Dr. Durwood Hodges completed this form on July 2, 1998, and then classified plaintiff's *physical* impairment as "Class 1," meaning that she was "able to function under stress and engage in interpersonal relations (*no limitations*)."[24] On the other hand, Dr. Hodges characterized plaintiff's *psychiatric* impairment as "Class 5," defined as: "Severe limitation; incapable of minimal activity or sedentary work (75-100%)."[25] Dr. Hodges also recorded that:

> The [patient] has pain affecting all four extremities and the chest wall. She has diffuse musculoskeletal pain. [Patient] has difficulty holding her arms above the neutral position and has morning stiffness. She has also experienced fatigue. [Patient] is beginning treatment for fibromyalgia. At this time she is unable to perform her work duties but would be expected to improve by Aug 31, 1998.[26]

Even though Dr. Hodges concluded that plaintiff had a "good" prognosis for recovery, and indicated that further therapy would reasonably be expected to result in full or partial recovery, he nevertheless determined that she was not a candidate for rehabilitation.[27] Further, in response to the question of whether plaintiff would be able to return to work with job modifications, Dr. Hodges stated, "not at

---

[23] FOR-00176 (Layton Progress notes dated May 5, 1998) (emphasis supplied). Plaintiff questions the weight that should be given this note, in view of the fact that it was "generated two years prior to Fortis's re-evaluation of her eligibility for LTD benefits." Plaintiff's brief opposing summary judgment, at 3.

[24] FOR-00662 (emphasis in original).

[25] FOR-00663.

[26] *Id.*

[27] *Id.*

this time."[28]

On the same date that Dr. Hodges completed the foregoing form (July 2, 1998), Dr. Macon

Phillips wrote a letter to Hodges summarizing his impressions of plaintiff.[29] Dr. Phillips concluded

that plaintiff's symptoms appeared to be caused by fibromyalgia.[30] He noted, nevertheless, that, "[i]n

the absence of objective evidence of inflammatory disease, other than her direct tenderness, I do not

know whether or not she will qualify for long term disability benefits.  However, she does report

considerable pain, and so far medications have been ineffective."[31]

An independent Work Capacities Assessment of plaintiff was attempted by HealthSouth

Sports Medicine and Rehabilitation Center on November 23, 1998,[32] but terminated due to plaintiff's

complaints of pain — complaints which the evaluator characterized as "emergency level."[33]  Even

so, no significant increase in plaintiff's heart rate was recorded in conjunction with her complaints.[34]

The evaluator also observed that, while plaintiff complained of extreme difficulty when lifting her

arms over her head, she wore "a slip on dress" to the evaluation — *i.e.*, a dress that had "to be put

on over [her] head."[35]  For these reasons, the evaluator concluded that it was "questionable . . .

whether Ms. Webb put forth consistent effort . . . ."[36]

Dr. Hodges prepared an updated assessment of plaintiff's condition for Fortis on August 19,

---

[28] *Id.*

[29] FOR-00169 (Phillips letter dated July 2, 1998).

[30] *Id.*

[31] *Id.*

[32] FOR-00548-51 (HealthSouth Work Capacities Assessment dated November 23, 1998).

[33] FOR-00548.

[34] FOR-00551.

[35] *Id.*

[36] FOR-00548.

1999, utilizing a form entitled "Medical Assessment and Ability to Do Work Related Activities."[37] He stated that plaintiff would be limited to: (a) carrying five pounds for up to one-third of an eight hour workday, and two pounds from one-third to two-thirds of an eight hour workday; (b) walking for one to one and a half hours total, and thirty minutes uninterrupted; and (c) sitting for two hours in an eight hour work day, and thirty to thirty-five minutes uninterrupted.[38] Dr. Hodges concluded that plaintiff would be unable to climb, kneel, crouch, or crawl.[39]

Dr. Hodges submitted a supplemental evaluation to Fortis on August 28, 1999, in which he assigned plaintiff a "Class 4" physical impairment, defined as a: "Moderate limitation; capable of sedentary, clerical or administrative work — occasional 10# [pound] force, mostly sitting (60-70%)."[40] Dr. Hodges added that "she is limited to working [with] her arms [and] lifting over her head."[41]   In response to a question asking that Dr. Hodges "describe fully how [the] patient's symptoms/limitations affect [her] ability to work, e.g., how are work schedule or duties restricted and why?", he stated that: "She is limited in the amount of heavy work/amount of weight that she can lift/bundle. She is also limited to working overhead."[42] Finally, Dr. Hodges answered "yes" to the following questions: "Is patient a candidate for rehabilitation services?"; "Would job modification enable patient to work with impairment?"; and "Would vocational counseling and/or retraining be recommended?" Inconsistently, however, he assessed her prognosis for full recovery as "poor," and indicated (by checking "No") that "any further therapy would [not] be reasonably

---

[37] FOR-00192-93 ("Medical Assessment and Ability to Do Work-Related Activities" form dated Sept. 19, 1999).

[38] FOR-00193.

[39] Id.

[40] FOR-00117.

[41] Id.

[42] Id.

expected to result in full or partial recovery."[43]

Fortis mailed a letter to Dr. Hodges on September 7, 1999, requesting that he answer several additional questions to aid in the company's determination of plaintiff's claim of disability under the "any occupation" (*i.e.*, second) definition of disability.[44] Fortis received Dr. Hodges's response on September 29, 1999. When asked the prognosis for plaintiff returning to full/part-time work at her former occupation, Dr. Hodges responded: "She will be unable to do so."[45] When asked the same question as to any other occupation, Dr. Hodges responded: "Patient is totally disable [sic] and condition is expected to worsen."[46]

Dr. Hodges also completed a "Physical Capabilities Evaluation" of plaintiff for Fortis on September 20, 1999.[47] He concluded that she could perform the following functions for the periods specified during each eight-hour work day: (a) sit for two hours; (b) stand for one hour; (c) walk for one hour; and (d) drive for one hour.[48] Additionally, he opined that plaintiff could reach above her shoulder level, and that she could balance occasionally (1/4 to 2-1/2 hours). Finally, Dr. Hodges stated that plaintiff could occasionally lift and carry up to ten pounds.[49]

An independent review of plaintiff's file was conducted by Dr. Daniel D. Zimmerman on January 12, 2000.[50] He did not perform a physical examination.[51] Dr. Zimmerman concluded that, "[a]t this point, the only way one could ascertain this individual's current residual functional capacity

---

[43] *Id.*

[44] FOR-00124-00125.

[45] FOR-00124.

[46] *Id.*

[47] FOR-00120-21 ("Physical Capabilities Evaluation" form dated Sept. 20, 1999).

[48] FOR-00121.

[49] *Id.*

[50] FOR-00203-04 (Zimmerman review dated Jan. 12, 2000).

[51] Plaintiff's evidentiary submissions, Tab A (Higgins deposition), at 59-60.

would be to obtain a functional capacity evaluation, *in that her attending physician characterizes her as being 'disabled' without providing signs, symptoms, or diagnostic studies which permits such a conclusion to be rendered.*"[52]

Dr. Hodges completed a second Supplemental Evaluation of plaintiff for Fortis on January 25, 2000.[53] As with his previous, August 28, 1999 evaluation, Dr. Hodges assigned plaintiff a "Class 4" *physical* impairment, noted that "she is limited to working with her arms lifting over her head," and stated that "she is limited in the amount of heavy work/amount of weight that she can lift/bundle. She is also limited to working overhead."[54] Dr. Hodges also answered "yes" to the following questions: 1) "Is patient a candidate for rehabilitation services?"; 2) "Would job modification enable patient to work with impairment?"; and 3) "Would vocational counseling and/or retraining be recommended?"[55]

Fortis commissioned a second independent Functional Capacity Evaluation of plaintiff by TOP Rehab Services, Inc., on April 24 and 25, 2000.[56] The pertinent parts of the summary report read as follows:

> During Day 1 and Day 2 of testing, the client was willing to fully cooperate on portions of the test that required minimal effort. The client participated in most areas of testing with continuous encouragement from the therapist and continuous redirection of the client. The client consistently reported that she was unable to perform tasks required during testing before she had reached her safe maximum.
>
> The client was able to push a force of 23 pounds and pull with force of 29 pounds statically. *However, she was unable to push or pull a sled with a total weight of 45*

---

[52] FOR-00203-04 (Zimmerman review dated Jan. 12, 2000) (emphasis supplied).

[53] FOR-00171 (Supplementary Report for Benefits dated Jan. 25, 2000).

[54] *Id.*

[55] *Id.*

[56] FOR-00270-75 (TOP Rehab Services Functional Capacity Evaluation Summary Report dated April 24-25, 2000).

*pounds requiring less than 20 pounds of force to either push or pull. Also, there was no Bell curve on the left hand static grip testing results.*

*Client's functional limitations were not consistent with physical requirements. Perceived abilities were not consistent with results of the FCE.* The client was given the PACT Spinal Function Sort Test which is a measurement of the client's perceived abilities to perform functional tasks. There was inconsistency between the score on the Spinal Function Sort Test and the FCE. For example, the client's perception was that she was unable to carry a 20-pound bag of groceries. However, during FCE testing, she was able to perform front carry with 20 pounds. The client perceived that she was unable to climb a step ladder. However, during the FCE, she was able to climb the step ladder to ascend and descend the step ladder three steps 10 times. The client reported on the Spinal Function Sort that she perceived she was unable to push or pull a vacuum cleaner. However, she was able to push 23 pounds statically and pull 29 pounds statically. There were also inconsistencies noted on the Spinal function Sort Test. The client reported that she was unable to push or pull a vacuum. However, she was fully able to push or pull a shopping cart. She also stated that she had significant limitations in bending and handling weighted objects. However, she put that [sic] she was fully able to load and unload a dishwasher. The client reported on the Spinal Function Sort that she was unable to place or retrieve five pounds from waist to overhead. However, on the FCE, she was able to perform a waist-to-overhead lift of 15 pounds. *These are a few examples of inconsistencies between the client's perceived abilities as measured by the PACT Spinal Function Sort and her performance based on the FCE. Based on this information, it is concluded that the client's perception of pain is self-limiting.*

**PAIN BEHAVIOR:** During both days of testing, the client exhibited overt pain behaviors with continuous complaints of pain, fatigue, dizziness, and reports of inability to work to a maximum. *The majority of these pain behaviors were not evidenced by the physiological changes.*

**SIGNIFICANT ABILITIES:** Sitting tolerance, walking tolerance, standing tolerance, and bilateral upper extremity coordination.

**SIGNIFICANT DEFICITS:** Deconditioning, decreased overall endurance, and decreased balance. *Client's participation in the following tasks was self-limited:* lifts and carries, push/pull, elevated work, forward bending while sitting or standing, and repetitive squatting.

**RECOMMENDATIONS:** *The client's physical work strengths place her in a category of "light work."* According to the US Department of Labor and the Social Security Administration, "light work is defined as lifting no more than 20 lbs. on an occasional basis and up to 10 lbs. on a more frequent basis. Light work typically

requires standing and walking for six hours out of an eight-hour workday. Certain light jobs may require continuous sitting, however, and would also entail the consistent use of either hand or foot controls (e.g., crane operator, certain equipment operation jobs)." Light work is a category between "sedentary work" and "medium work."

The client reports that she has been off work for two years on Disability. Decreased strength, mobility, and endurance result from progressive inactivity. Therefore, the client may benefit from a work conditioning program to increase her physical abilities and to further address inconsistencies between the client's perceived abilities and her actual abilities.[57]

The TOP Rehab functional capacity evaluation also concluded that plaintiff could sit, stand, or walk for the majority to all (i.e., 67% to 100%) of an eight hour workday. The only limitation noted was that plaintiff take frequent stretch breaks.[58]

Concentra Managed Care Services prepared, at Fortis' request, a "Labor Market Research" survey on June 29, 2000.[59] Fortis claims that this survey took into consideration plaintiff's pre-injury job position, her diagnosis, her education, and the results of TOP Rehab's April 2000 Functional Capacity Evaluation that concluded that plaintiff qualified for "light work."[60] The survey identified many transferable skills possessed by plaintiff, including:

1.  the ability to work under pressure and meet deadlines;

2.  the ability to operate machinery;

3.  the ability to work independently;

4.  the ability to communicate and interact effectively with individuals of all levels;

5.  the ability to follow written and verbal instructions/orders;

---

[57] FOR-00270-72 (emphasis supplied).

[58] FOR-00275. During his deposition, Dr. Hodges stated that he did not dispute the findings of this Functional Capacity Evaluation. Defendant's evidentiary submissions, Tab 2 (Hodges deposition), at 17, 24-25, 33. Moreover, Dr. Hodges conceded that the evaluation he provided for plaintiff was not based on any physical testing. *Id.* at 22.

[59] FOR-00332-36 (Labor Market Survey dated June 29, 2000).

[60] FOR-00332.

6.  her 15 ½ years of experience in operating light industrial machinery;

7.  her demonstrated ability to work well in a team environment;

8.  her demonstrated ability in attention to detail;

9.  her knowledge and basic understanding of work related safety issues; and

10. the ability to use both hands to perform duties required, such as grip/push/pull.[61]

The survey also identified the following occupational alternatives, based upon plaintiff's transferable skills and physical limitations:  cashier, seamer, sewing machine operator, inspector, and order puller.[62]  The survey listed several open positions in these fields in the Huntsville/Scottsboro, Alabama area, and concluded that:

> The above information is a sampling of the positions for which Ms. Webb would qualify in her labor market based on either transferable skills or entry level opportunities and which meet Ms. Webb's physical capabilities according to the FCE report results and the Dictionary of Occupational Title.  This information clearly demonstrates that these are vocational opportunities which could return Ms. Webb to gainful employment at 100% of her pre-injury wage.[63]

Dr. Hodges prepared a second "Medical Assessment and Ability to Do Work Related

---

[61] FOR-00332-33.

[62] FOR-00333.

[63] FOR-00333-36.  Plaintiff attempts to cast doubt on the efficacy of Concentra's "Labor Market Research" survey with the following argument:

> The only file information on the Plaintiff the Concentra Labor Market Research indicates was reviewed was the Functional Capacity Evaluation dated 4/24/00 and 4/25/00 and the Dictionary of Occupational Titles.  (Plaintiff's Exhibit B, FOR_00332-00336).  At her deposition, Ms. Higgins indicated that the people who prepared the Labor Market Research report were not asked whether Plaintiff could perform all the material duties of the occupations listed.  (Plaintiff's Exhibit A, Depo. of Tamera Higgins, pp. 109-110).  Ms. Higgins also confirmed that Fortis did not request Concentra to do any evaluation of Plaintiff's education and mental ability, or psychometric testing of the sort related in Plaintiff's vocational expert's report.  (Plaintiff's Exhibit A, Depo. of Tamera Higgins, pp. 110-111; Plaintiff's Exhibit 18 to Depo. of Tamera Higgins,  pp. FOR-00210-00215).

Plaintiff's brief, at 4.

Activities" form for plaintiff on July 24, 2000.[64]  He again stated that plaintiff would be limited to:

(a) carrying five pounds for up to one-third of an eight hour workday; (b) walking for three hours

total, and one hour uninterrupted; and (c) sitting for three hours in an eight hour work day, and one

hour uninterrupted.  He further indicated that plaintiff would be unable to climb or crawl.  When

asked to describe the medical findings that supported his assessments, Dr. Hodges responded, for

each category, that the  basis was plaintiff's subjective complaints of pain.[65]

## C.    Denial of Further LTD Benefits to Plaintiff

Fortis denied plaintiff's claim for benefits beyond the first twenty-four months of the onset

of her condition on July 13, 2000.  The pertinent parts of its denial letter read as follows:

> A Functional Capacity Evaluation performed on April 24-25, 2000 has shown that
> you are able to sit and/or stand 67-100% of an eight hour day.  The evaluation
> concluded that you did not demonstrate full effort at the exam, but, based on the
> effort given, you are capable of performing in a light work category.  Light work is
> exerting occasionally 20 pounds of force and/or up to 10 pounds frequently.
>
> Based on your physical abilities, Fortis Benefits arranged to have a Labor Market
> Survey performed in your geographic area.
>
> Fortis Benefits Insurance Company has identified several occupations that are within
> your physical abilities and which would provide a gainful wage to you.  In addition,
> these positions are within your geographic region as well as your educational
> background and work history.  Positions in the following areas were identified with
> current openings:  cashier, seamer, sewing machine operator, inspector, and order
> puller.  A copy of this report is enclosed and we encourage you to contact these
> employers and apply for any one of these positions.
>
> Because occupations with gainful wages have been identified for you within your
> physical limitations and are in your geographic region, no further Long Term
> Disability benefits can be released to you.  You no longer meet the definition of
> disability as required under this policy.  Therefore, benefits beyond June 30, 2000

---

[64] FOR-00217-18 ("Medical Assessment and Ability to Do Work-Related Activities" form dated July 24, 2000).
[65] FOR-00218.

-15-

have been denied.[66]

**D.     The First Appeal**

At some unspecified point between June 24 and September 11, 2000, plaintiff independently commissioned a "Vocational Assessment" by Bramlett and Associates.[67] The report of evaluation concluded that plaintiff was

> totally vocationally disabled for any competitive employment since her long-term treating physician has given the opinion that she cannot perform at even a sedentary level of work on a full-time basis (see Dr. Hodge's assessment of her physical functioning). She has a marginal education (6th grade), is functioning at the 3rd to 6th grade level per psychometric testing. She has no ability to perform any past relevant work and has no transferable skills to other jobs of any kind. She is fifty-five years of age and is not employable, in my opinion.[68]

Plaintiff appealed the denial of long-term disability benefits on September 11, 2000.[69] She enclosed: the Bramlett vocational assessment; records from Rheumatology Associates; records from The Heart Center, P.C.; a functional capacity evaluation performed by Dr. Hodges; a medical letter-report from Dr. Rhett Murray; and additional records from Dr. Hodges's file.[70] Fortis acknowledged receipt of plaintiff's appeal on September 15, 2000.[71]

Tamera Higgins, a Disability Appeals Specialist employed by Fortis, notified plaintiff's attorney by a letter dated October 18, 2000 that she had been assigned the appeal.[72] Barry D. Turner, M.D., a physician employed by Fortis, was requested to conduct a review of plaintiff's claim. Dr. Turner did not physically examine plaintiff, but only reviewed the documentation pertinent to her

---

[66] FOR-00321-22 (Fortis letter July 13, 2000) (emphasis in original).

[67] FOR-00313-18 (Bramlett Vocational Assessment dated September 11, 2000).

[68] FOR-00318.

[69] FOR-00209 (Higgs letter dated Sept. 11, 2000).

[70] *Id.*

[71] FOR-00308-09 (Fortis letter dated Sept. 15, 2000).

[72] FOR-00206 (Fortis letter dated Oct. 18, 2000).

-16-

claim.[73]  His report discussed the documentation that had been generated regarding plaintiff's

condition, and concluded that she was capable of performing "any light level occupation."[74]

Fortis notified plaintiff that it sustained the denial of her request for benefits by means of a

letter dated December 11, 2000, and addressed to her attorney.  The pertinent parts of that letter read

as follows:

> We have completed our review of our prior denial of Ms. Webb's long term disability
> claim.  At this time we have found that the prior determination to deny benefits on
> this claim is appropriate.
>
> . . .
>
> We have completed our review of this claim based on the medical and occupational
> information submitted to date.  This includes medical information from Drs. Hodges,
> Hunter, Layton, Murray, Patel and Phillips, pharmacy records from Hood Discount
> Drugs, the November 23, 1998, Functional Capacities Evaluation, the April 24 and
> April 25, 2000, Functional Capacities Evaluation, the June 29, 2000, Labor Market
> Survey and the October 24, 2000, medical director review.
>
> . . .
>
> A review of the November 23, 1998, Functional Capacities Evaluation Test results
> revealed that the claimant exhibited signs of high pain behavior and symptom
> magnification throughout the evaluation process.  Some of the inconsistencies
> documented were that the claimant reported she could not reach overhead yet the
> staff noted she wore a slip and dress that had to be put on overhead.  There was no
> significant increase in heart rate during the reports of extreme pain. The five-position
> Jaymar grip did not produce bell curves, which would have indicated consistent
> effort.  In addition, Ms. Webb scored high on the Waddell's signs of inorganic
> behavior and exhibited limited effort.  Due to the above noted inconsistencies the
> final test results are essentially invalid.
>
> The results of the April 24 and April 25, 2000, Functional Capacities Evaluation also
> indicated that the claimant did not give maximum consistent effort. During both days
> of testing the claimant exhibited overt pain behaviors with continuous complaints of
> pain, fatigue and dizziness.  There were no physiological changes noted during the

---

[73] Plaintiff's evidentiary submissions, Tab A (Higgins deposition), at 59.

[74] FOR-00063-65 (Turner assessment dated October 24, 2000).

majority of these pain behaviors. Despite the claimants inconsistent efforts it was concluded that she was capable of performing within the light level work category. Generally light level work consists of a combination of sitting, standing and walking at will and may require maximum lifting of twenty pounds.

As you are aware we found it necessary to have the available medical evidence in Ms. Webb's claim file reviewed by our on site medical director. The physician, who is a board certified orthopedic surgeon, noted that Dr Layton expressed concern over the claimant's complete refusal to return to work. The bone scan, GI and pulmonary work-up were all normal. Neurological testing as well as corresponding studies have also been normal. She has had numerous physical examinations, which do not reveal any pathological findings. Based on the evidence submitted it was opined that most likely fibromyalgia is the most appropriate diagnosis. However, the claimant has not required narcotic analgesics for the relief of pain. In conclusion, it was opined that although the claimant could not perform medium level work she appears capable of light level work.

We acknowledge the claimant's complaints of pain. However, a medical condition does not, in and of itself, imply disability. Based on our evaluation of the available information there has been no evidence submitted to date that supports the severity of the condition and symptoms reported. The claimant has demonstrated the ability to perform with the light level work category, which would allow her to change positions as needed. As stated in our July 13, 2000, correspondence (additional copy enclosed) several occupations have been identified within Ms. Webb's geographic that she would physically be able to perform and would allow her to earn a gainful wage. Per the terms of our group policy, a gainful occupation would be the ability to earn at least the scheduled amount or $900.00 per month. Thus, based on the submitted evidence Ms. Webb is not considered disabled according to the above stated occupation test and our decision to deny benefits beyond June 30, 2000, was appropriate.

Enclosed is a copy of the Fortis Benefit's Group Claim Denial Review Procedure. This is to represent the claimant's notification of denial and the applicable claim denial review procedure. Please note that Ms. Webb has one more level of appeal available. She may request that the Fortis Benefits Disability Appeals Committee review this decision. [75]

E.     **The Second Appeal**

Plaintiff's attorney mailed a letter to Fortis on January 17, 2001, requesting a review of the

---

[75] FOR-00058-60 (Fortis letter dated Dec. 11, 2000) (underlined and italicized emphasis in original).

decision to affirm the initial denial of benefits.[76] Fortis acknowledged receipt of the second request for an appeal by letter dated January 31, 2001.[77]

Fortis mailed plaintiff's attorney a letter describing its final resolution of the matter on February 11, 2001.  The letter stated that the Disability Appeals Committee had convened to review plaintiff's appeal for long term disability benefits, and determined that the prior decision to deny benefits on the claim was appropriate and should be upheld.[78]

Plaintiff submitted "new evidence" in support of her claim for benefits on March 27, 2001.[79] This evidence consisted of a medical assessment completed by Dr. Henry J. Chen, and a letter prepared by him.[80]  That submittal was unavailing, however.  Fortis affirmed its earlier denial of plaintiff's claim on April 18, 2001, saying:

> We are in receipt of your correspondence dated March 27, 2001, and the accompanying medical information from Drs. Chen and Patel.
>
> Please note that this information is not in conflict with the prior evidence reviewed by the Committee members.  As it was stated in our final determination letter dated February 21, 2001, we are not disputing that Ms. Webb has medical conditions. However, the Committee determined that the diagnoses of record do not preclude Ms. Webb from performing a gainful occupation.  At this time, your client has exhausted the administrative remedies available to her.  Our position on this matter remains the same.[81]

This suit followed.

## II. DISCUSSION

As a threshold matter, the court must determine the appropriate standard for reviewing

---

[76] FOR-00057 (Higgs letter dated Jan. 17, 2001).

[77] FOR-00056 (Fortis letter dated Jan. 31, 2001).

[78] FOR-00051-52 (Fortis letter dated Feb. 21, 2001) (underlined and italicized emphasis in original).

[79] FOR-00043-50.

[80] *Id.*

[81] FOR-00042 (Fortis letter dated Apr. 18, 2001).

Fortis's denial of plaintiff's claims, because ERISA does not specify the standard applicable to the decisions of a plan administrator or fiduciary. *See Jordan v. Metropolitan Life Insurance Co.*, 205 F. Supp. 2d 1302, 1305 (M.D. Fla. 2002) (citing, *e.g.*, *Marecek v. BellSouth Telecommunications*, 49 F.3d 702, 705 (11th Cir. 1995) (other citation omitted)).

The Supreme Court held in *Firestone Tire & Rubber Co. v. Bruch* that "a denial of benefits . . . is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility benefits or to construe the terms of the plan." 489 U.S. 101, 115, 109 S. Ct. 948, 956-57, 103 L. Ed. 2d 80 (1989). Pivoting off the *Bruch* decision, the Eleventh Circuit has promulgated three standards applicable to a claim administrator: "(1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary and capricious [where] the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interests." *Buckley v. Metropolitan Life Insurance Co.*, 115 F.3d 936, 939 (11th Cir. 1997). Here, the plan grants the claims administrator the discretion to construe the terms of the plan. Further, because Fortis serves both as claim administrator and pays claims from its own funds, it has a conflict of interests. Fortis accordingly "concedes that the heightened arbitrary and capricious standard of review applies to this case."[82]

Under the heightened arbitrary and capricious standard, the court must first determine on *de novo* review whether Fortis's decision to deny plaintiff further LTD benefits was "wrong." *See HCA Health Services of Georgia v. Employers Health Insurance Co.*, 240 F.3d 982, 993 n.23 (11th Cir. 2001) ("'Wrong' is the label used by our precedent to describe the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the claim

---

[82] Fortis' brief, at 29.

administrator's plan interpretation."). The court moves to the next step in its inquiry, to examine Fortis's conflict of interests, only if Fortis's decision is first deemed to be "wrong." *See, e.g., Brown v. Blue Cross & Blue Shield of Alabama*, 898 F.2d 1556, 1566 n.12 (11th Cir. 1990) ("It is fundamental that the fiduciary's interpretation first must be 'wrong' from the perspective of *de novo* review before a reviewing court is concerned with the self-interest of the fiduciary.") (emphasis supplied); *Morency v. Rudnick & Wolfe Staff Group Long Term Disability Insurance Plan,* No. 899CV2688T24MAP, 2001 WL 737531, at *3 (M.D. Fla. Jan. 31, 2001) ("Applying the heightened arbitrary and capricious standard, the plaintiff must first establish that the decision made by the ERISA administrator was 'wrong.'") (quoting *Brown*, 898 F.3d at 1566-67 n.12). Simply put, if the court finds that Fortis's decision to deny plaintiff LTD benefits was not "wrong," the inquiry is at an end, and summary judgment is due to be granted in Fortis's favor.

Upon careful review of the extensive administrative record documenting plaintiff's condition, as well as the deposition testimony of individuals explaining the contents of that record, this court cannot say that Fortis's decision to discontinue plaintiff's LTD benefits was "wrong." The evidence convincingly indicates that plaintiff's condition does not prevent her from performing sedentary work.

Plaintiff's primary treating physician, Dr. Durwood Hodges, submitted no less than seven assessments of plaintiff's physical impairments between 1998 and 2000. His characterizations of her impairment flip-flopped between "totally disable[d]" and a "Class 4" physical impairment, which indicates a "[m]oderate limitation; capable of sedentary, clerical or administrative work — occasional 10# [pound] force, mostly sitting." His most recent evaluation, however, assigned

plaintiff a "Class 4" impairment,[83] and his most recent "medical assessment and ability to do work-related activities" evaluation indicated that she was capable of standing or walking three hours per day (but only one hour uninterrupted) and that she was capable of sitting three hours per day (but only one hour uninterrupted).[84]

Plaintiff sought the opinion of another physician, Dr. Henry Chen, as part of her appeal of Fortis's decision to deny her LTD benefits beyond the initial twenty-four months. Dr. Chen also completed a "medical assessment and ability to do work-related activities" form on plaintiff's behalf.[85] Dr. Chen's findings were substantively identical to Dr. Hodges's: *i.e.*, he concluded that plaintiff was capable of standing or walking three hours per day total (but only one hour uninterrupted), and, that she was capable of sitting three hours per day (but only one hour uninterrupted).[86] In fact, no physician who has physically examined plaintiff or reviewed her file currently opines that she is unable to perform sedentary work for roughly six hours per day.

The only professionals who continue to assert that plaintiff is "totally vocationally disabled" are two Certified Rehabilitation Counselors employed by Bramlett and Associates, who were retained by plaintiff to assess her condition during the pendency of her appeal. The Bramlett assessment opined that plaintiff is "totally vocationally disabled for any competitive employment since her long-term treating physician [Dr. Hodges] has given the opinion that she cannot perform at even a sedentary level of work on a full-time basis."[87] In view of the fact that the opinion

---

[83] FOR-00171 (Supplementary Report for Benefits dated Jan. 25, 2000).

[84] FOR-00217-18 (Medical Assessment and Ability to Do Work-Related Activities" form dated July 24, 2000).

[85] FOR-00048-49 (Medical Assessment and Ability to Do Work-Related Activities" form dated March 26, 2001).

[86] *Id.*

[87] FOR-00318 (Bramlett Vocational Assessment dated September 11, 2000).

expressed in the Bramlett assessment is largely based on an outdated summary of Dr. Hodges's findings, the court finds that Fortis was not "wrong" when it declined to reverse its decision.

The other studies which examined the extent of plaintiff's disability were the functional capacity evaluations performed by HealthSouth and TOP Rehabilitation Services.[88]  Both studies recorded that plaintiff's performance on various diagnostic tests was inconsistent, and that such results indicated that she was magnifying her level of impairment.  The HealthSouth study did not express an opinion as to the level of work that plaintiff could perform, for reasons previously discussed, but the TOP Rehabilitation study found that plaintiff was capable of performing "light work," which "is a category between 'sedentary work' and 'medium work.'"[89]  To summarize, the results of both functional capacity evaluations weigh in favor of concluding that plaintiff is capable of performing sedentary work.

Finally, the Concentra Managed Care Services labor market survey evaluated plaintiff's job skills, researched the job market in plaintiff's immediate area, and identified several occupations that plaintiff could appropriately fill, given her limitations.  The court finds that the conclusions reached in that survey are well-supported by the facts recited, and that plaintiff's prospects for securing and maintaining employment as a cashier, seamer, sewing machine operator, inspector, or order puller are reasonably good, should she decide to return to the workplace.[90]

---

[88] The court notes that the Bramlett assessment included an objective test of plaintiff's intelligence and level of education.  However, the results of such tests are not relevant to the question posed here — whether plaintiff suffers from such intense pain that she is totally disabled. *See* FOR-00317.  Further, despite the fact that the Bramlett assessment concluded that plaintiff is poorly educated, there is no evidence that her level of intelligence or education adversely impacted her performance at any of her former jobs, or, that her intelligence and education are not adequate to meet the standards prerequisite to secure such sedentary jobs as "cashier" or "order puller."  *See* FOR-00332-00336.

[89] FOR-00272 (TOP Rehab Services Functional Capacity Evaluation Summary Report dated April 24-25, 2000).

[90] FOR-00332-36 (Labor Market Survey dated June 29, 2000).

## III. CONCLUSION

For the foregoing reasons, Fortis's motion for summary judgment is due to be granted. An appropriate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this **28th** day of May, 2003.

_____
United States District Judge

-24-